**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF IOWA**
**CEDAR RAPIDS DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>Plaintiff,<br>vs.<br><br>ANTONIO ROBERTSON,<br>Defendant. | Case No. 25-cr-99-CJW<br><br>**REPORT AND RECOMMENDATION ON DEFENDANT'S MOTION TO SUPPRESS** |

---

**TABLE OF CONTENTS**

**Page**


***I. INTRODUCTION*** ..... **2**

***II. FINDINGS OF FACT*** ..... **5**

- ***A. July 25, 2025 Traffic Stop*** ..... **5**
- ***B. The Green Gable Inn Shooting and the Search Warrant*** ..... **7**

***III. DISCUSSION*** ..... **13**

- ***A. The Parties' Arguments*** ..... **13**
- ***B. The Traffic Stop*** ..... **17**
  - ***1. Relevant law*** ..... **17**
  - ***2. Application*** ..... **20**
- ***C. Defendant's Statements*** ..... **23**
- ***D. The Search Warrant for the K Street Residence*** ..... **24**

*1. Relevant law* .......................................................... 24

*2. Application* .......................................................... 28

*E. Is the* **Leon** *good faith exception applicable?* ................................ 37

*IV. CONCLUSION* .......................................................... 44

## *I. INTRODUCTION*

On December 30, 2025, a Complaint was filed against Defendant. (Doc. 2.) On January 6, 2026, the Grand Jury returned an Indictment charging Defendant with one count of Distribution of a Controlled Substance in violation of 21 U.S.C. Sections 841(a)(1) and 841(b)(1)(C). (Doc. 16.) On June 3, 2026, the Grand Jury returned a Superseding Indictment charging Defendant with one count of Conspiracy to Distribute a Controlled Substance in violation of 21 U.S.C. Sections 841(a)(1) and 841(b)(1)(A), Possession with Intent to Distribute a Controlled Substance in violation of 21 U.S.C. Sections 841(a)(1) and 841(b)(1)(A), one count of Aiding and Abetting the Distribution of a Controlled Substance in violation of 18 U.S.C. Section 2 and 21 U.S.C. Sections 841(a)(1) and 841(b)(1)(C), one count of Distribution of a Controlled Substance in violation of 21 U.S.C. Sections 841(a)(1) and 841(b)(1)(C), one count of Possession of Ammunition by a Felon (Armed Career Criminal) in violation of 18 U.S.C. Sections 922(g)(1), 924(a)(8), and 924(e)(1), and one count of Possession of a Firearm by a Felon (Armed Career Criminal) in violation of 18 U.S.C. Sections 922(g)(1), 924(a)(8), and 924(e)(1). (Doc. 34.)

The matter before me is Defendant's motion to suppress. (Doc. 41.) Defendant seeks to suppress all evidence seized from the traffic stop of July 25, 2025 (*see* Def. Ex. B, Doc. 41-3) and all evidence seized from the search of a residence on K Street SW in

Cedar Rapids ("the K Street residence") on December 30, 2025 (*see* inventory at Def. Ex. C, Doc. 4-5 at 4). The Government filed a timely response. (Doc. 49.) The Honorable C.J. Williams, Chief United States District Court Judge, referred the motion to me for a Report and Recommendation. I held a hearing on Defendant's motion to suppress on August 4, 2026. (Doc. 50.)

At the hearing, the Government's exhibits were admitted without objection:

1. Confidential Informant Report dated July 25, 2025;
2. Flock Safety Investigative Summary dated July 25, 2025;
3. Cedar Rapids Police Report (Supplement) dated July 26, 2025 by Officer Skylar Mullins;
4. Dash Camera Video;
5. Body Camera Video;
6. Security camera video from Green Gable Inn;
7. Security camera video from Green Gable Inn;
8. Security camera video from Green Gable Inn;
9. Security camera video from Green Gable Inn;
10. State of Iowa Search Warrant dated December 30, 2025 for the K Street residence;
11. Testimony Transcript of N.H.;
12. Body Camera Video of Defendant's Arrest; and
13. Cedar Rapids Police Report (Supplement) dated January 7, 2026 by Officer Melinda Rauwolf.

At the hearing, the Government called three witnesses: Investigator Christopher Brand,[1] Officer Taylor Pfiffner,[2] and Investigator Joshua Bell.[3] I found the witnesses credible.

At the hearing, Defendant's exhibits were admitted without objection:

A. Cedar Rapids Police Report (Supplement) dated July 26, 2025 by Officer Taylor Pfiffner;

B. Cedar Rapids Police Report (Supplement) dated July 28, 2025 by Officer Nicholas Nolte;

C. State of Iowa Search Warrant dated December 30, 2025;

D. Cedar Rapids Police Report (Supplement) dated December 21, 2025 by Officer Shannon Aguero Jones;

E. Cedar Rapids Police Report (Supplement) dated December 31, 2025 by Officer Joshua Bell;

F. Cedar Rapids Police Report (Supplement) dated December 31, 2025 by Officer Joshua Bell regarding the K Street residence search warrant; and

G. Drone video of the K Street residence.

For the following reasons, I respectfully recommend that the District Court **deny** Defendant's Motion to Suppress.

---

[1] Inv. Brand is employed by the Cedar Rapids Police Department ("CRPD") and is currently assigned to the DEA Task Force. (Brand Hr'g Test. at 7.)

[2] Officer Pfiffner has been employed by the CRPD as a police officer for seven years. (Pfiffner Hr'g Test. at 60-61.)

[3] Inv. Bell is employed by the CRPD since 2002 and is currently a narcotics investigator. He has been in that role for approximately seven months. Prior to that role, he was a crimes against persons investigator for approximately five years. (Bell Hr'g Test. at 81-82.)

## *II. FINDINGS OF FACT*

### *A. July 25, 2025 Traffic Stop*

Inv. Brand testified that on July 25, 2025, a confidential source ("CS") informed him that Defendant would be leaving Cedar Rapids for Chicago to obtain approximately three pounds of methamphetamine and an undetermined amount of heroin. (Brand Hr'g Test. at 7.) Later that same day, the CS informed Inv. Brand that Defendant was leaving shortly for Chicago and provided Defendant's license plate number. (*Id.* at 8.) The license plate belonged to a 2010 silver Dodge Charger and was registered to Defendant. (*Id.*) Inv. Brand had the license plate entered into the Flock license plate reader system to corroborate the CS's information that Defendant would be traveling between Cedar Rapids and Chicago. (*Id.*) Inv. Brand testified that there were two Flock hits, one from an exit ramp near Peru, Illinois, and the other, shortly thereafter, entering the on-ramp.[4] (*Id.* at 6; Gov. Ex. 2.) Inv. Brand also testified that based on his training and experience as a drug investigator, Chicago is a common location where drug traffickers from Eastern Iowa obtain drugs and a day trip from Cedar Rapids to Chicago and back is consistent with a trip to obtain drugs.[5] (*Id.* at 10.) Inv. Brand also indicated that the Flock hits were consistent with the information provided by the CS. (*Id.* at 10-11.)

After receiving a Flock hit showing Defendant had returned to Cedar Rapids, Inv. Brand contacted another officer and informed that officer of the information provided by the CS, the Flock hits, and a potential location for Defendant's vehicle in Cedar Rapids. (*Id.* at 11.) Officers did not locate Defendant's vehicle at the initial location provided by Inv. Brand. Later, the CS contacted Inv. Brand again, after Defendant had returned to Cedar Rapids, and informed Inv. Brand that Defendant was at a Cedar Rapids storage

---

[4] Peru, Illinois is approximately one hour and forty-five minutes from Chicago. (Brand Hr'g Test. at 30.) There were no other Flock alerts in Illinois and none in Chicago. (*Id.* at 30-31.)
[5] Defendant is also from Chicago. (Brand Hr'g Test. at 34.)

facility. Inv. Brand passed this information on to other officers and they located Defendant's vehicle at the storage facility. (*Id.* at 12.)

After locating Defendant's vehicle, officers contacted Officer Pfiffner and his partner, Officer Mullins, and provided them with coordinates to put them in the path of Defendant. The officers located Defendant's vehicle exiting I-380, approaching 29th Street. (Pfiffner Hr'g Test. at 62.) Officer Pfiffner determined that Defendant was speeding, driving 42 miles per hour in a 35 mile per hour zone. In his testimony, Officer Pfiffner explained that:

> As [Defendant's] vehicle passed us in the left lane, we caught up to the vehicle, and, as we got to 42 miles per hour, I observed [Defendant's] vehicle, as we were traveling in the right lane and it was in the left lane, and we were maintaining the same distance from the [Defendant's] vehicle, not getting any closer to it or the parties away from the vehicle.

(*Id.* at 63.) Officer Pfiffer reiterated that:

> Because when we were at—when we caught up to [Defendant's] vehicle and we were traveling and our distance was consistent, not getting any closer or farther away from [Defendant's] vehicle, I looked down and our speedometer said that we were going 42 miles per hour. So if we were not getting any closer or farther away, it would mean that [Defendant's] vehicle was also traveling 42 miles per hour.

(*Id.* at 64, Gov. Ex. 4.) Officer Pfiffner also testified that he observed a license plate frame on Defendant's vehicle, obstructing portions of the top of the license plate, which is a violation of the Iowa Code.[6] (*Id.* at 66-67, Gov. Ex. 2.)

---

[6] Officer Mullins's report indicates that he did not observe the license plate frame covering the top portion of the license plate until the traffic stop had been effectuated. (Gov. Ex. 3.) On cross-examination, Officer Pfiffner acknowledged that his report does not state that he observed the license plate violation prior to effecting the traffic stop. (Pfiffner Hr'g Test. at 79, Def. Ex. A.) This possible infraction is mentioned in passing in the Government's brief. (Doc. 49-1 at 4.) However, it appears that the Government is not relying on how the plate was displayed or obscured as a basis for the stop and it need not be addressed further.

The officers activated the emergency lights on their patrol vehicle and eventually Defendant pulled over. Officer Pfiffner approached the driver's side of the vehicle and made contact with Defendant. Officer Pfiffner requested Defendant's driver's license, registration, and proof of insurance. Upon receiving Defendant's information, Officer Pfiffner began returning to his vehicle to run the information through CRPD dispatch, but at that point, a K9 officer arrived on the scene. Officer Pfiffner intended to speak with the K9 officer and realized he did not have his body camera, which was charging in his patrol vehicle. Officer Pfiffner returned to his patrol car to retrieve the body camera. After retrieving the body camera, Officer Pfiffner went back to Defendant's car to assist in removing Defendant from the vehicle. Once Defendant was out of the vehicle, Officer Pfiffner returned to the patrol car to run Defendant's information. At this point, the K9 officer advised Officer Pfiffner that his dog had alerted on Defendant's vehicle for the odor of narcotics.[7] Officer Pfiffner went to Defendant and asked Defendant whether there was anything illegal in the car and advised Defendant that the vehicle was going to be searched based on the dog alert. Upon searching the vehicle, Officer Pfiffner's partner located a large bag of methamphetamine in the front passenger seat. Defendant was detained and transported to the police station for questioning by narcotics investigators. (Def. Ex. A.)

***B. The Green Gable Inn Shooting and the Search Warrant***

On December 20, 2025, Defendant was identified as the suspected shooter during a shooting at the Green Gable Inn, a bar in Cedar Rapids. (Bell Hr'g Test. at 81-84,

---

[7] Officer Mullins's report provides that after Defendant and the passenger were removed from the vehicle, the K9 officer and his dog performed an open air sniff around the car. The K9 officer told Officer Mullins and Officer Pfiffner that the dog had indicated on the vehicle, and Officer Mullins began to search it. Officer Mullins found a blue draw-string bag wedged between the passenger seat and center console that contained a large quantity of methamphetamine. (Gov. Ex. 3.) Defendant does not challenge the legality of the dog sniff.

Gov. Exs. 6-8.) Green Gable video surveillance also shows Defendant leaving the scene after the shooting in a Jaguar. (*Id.* at 83, Gov. Ex. 9.) Details about the shooting will be discussed below in relation to the Defendant's subsequent arrest and search of the K Street residence.

On December 30, 2025, law enforcement obtained a criminal complaint, charging Defendant with distribution of a controlled substance in violation of 21 U.S.C. § 841(a)(1), and a federal arrest warrant. (Docs. 2 & 3). Law enforcement believed Defendant was at a Cedar Rapids residence on K Street SW on December 30, 2025. Inv. Brand explained law enforcement's belief as follows: (1) on December 2, 2025, law enforcement conducted physical surveillance on the K Street residence and observed vehicles Defendant had used, a Silver Genesis and a Jaguar, parked near the residence; (2) on December 2, 2025, law enforcement observed Defendant exit the K Street residence; (3) on December 2, 2025, precision location data from Defendant's phone also pinged in the general area of the K Street residence;[8] (4) on December 30, 2025, precision location data from Defendant's phone again pinged in the general area of the K Street residence; (5) the K Street residence belonged to N.H., a close acquaintance or girlfriend of Defendant; and (6) on December 30, 2025, there was a vehicle rented by N.H. parked at the residence and law enforcement had knowledge that throughout the investigation, Defendant used different vehicles including vehicles rented in his name and rented in N.H.'s name. (Brand Hr'g Test. at 13-15.) After obtaining the federal complaint and arrest warrant, Inv. Brand obtained a state search warrant for the K Street residence, authorizing law enforcement to search the K Street residence for Defendant and take him into custody. (*Id.* at 15-16.)

---

[8] Precision location date does not provide an exact location for an individual but provides a general area/radius for an individual's location. (Brand Hr'g Test. at 16-17.)

CRPD's SWAT team was utilized to execute the warrant. Announcements were made with a loudspeaker and telephone calls were placed to possible occupants inside for Defendant to exit the K Street residence. Defendant exited the residence and was taken into custody. (*Id.* at 20.)

After Defendant was taken into custody on December 30, 2025, on the federal arrest warrant, Inv. Bell applied for a state search warrant to search the K Street residence for items related to the Green Gable shooting. (*Id.* at 90.) Attached to the search warrant application was Inv. Bell's affidavit:

> [XXXX] K Street Southwest Cedar Rapids, Linn County Iowa 52404. Described as a wood framed, multifamily dwelling with tan vinyl siding, white trim and detached garage. The numbers [XXXX] are displayed in black vertical numbers on the right pillar of the front porch facing K street southwest. The search to include the residence, any structures on the property, at [XXXX] K Street Southwest Cedar Rapids, Linn County Iowa 52404, along with any vehicles registered to, or known to be operated by anyone known to reside at [XXXX] K Street Southwest Cedar Rapids, Linn County Iowa 52404.
>
> The person of Antonio ROBERTSON, DOB: [XX-XX-XXXX], a black male, 6'1", 270lbs, hazel eyes, black hair, SS#[XXX-XX-XXXX], and FBI #[XXXXXXXXX].
>
> During a joint Drug Enforcement Administration and joint Cedar Rapids Police Department drug investigation Antonio ROBERTSON was identified as a distributor of heroin/fentanyl and methamphetamine.
>
> On December 2, 2025, DEA was conducting surveillance in the area of [XXXX] K Street SW, Cedar Rapids, Iowa (TARGET RESIDENCE). DEA investigators observed a gray Genesis GV80 bearing Iowa License Plate [XXXXXXXX]. This vehicle was registered to Enterprise Rental Car. Enterprise provided information that the vehicle was rented by Antonio ROBERTSON on November 26, 2025 and was due back on November 28, 2025 but was not yet returned.

During the surveillance on December 2, 2025, DEA investigators observed ROBERTSON exit the TARGET RESIDENCE wearing a yellow sweatshirt and a yellow hat. ROBERTSON was observed entering and exiting the TARGET RESIDENCE. ROBERTSON was observed operating the Genesis GV80 and a Jaguar XJL both located near the TARGET RESIDENCE. Furthermore, during the surveillance DEA investigators were observing precision location on ROBERTSON's telephone [(XXX) XXX-XXXX]. ROBERTSON precision location data showed ROBERTSON cell phone in the area of the TARGET RESIDENCE when ROBERTSON was physically observed by investigators at the TARGET RESIDENCE. It is important to note, precision location data is often times not precise in nature but gives a likely radius in which the cellular telephone can be located in.

Utilizing open-source information, DEA investigators located [N.H.] as have an address of the TARGET RESIDENCE. Utilizing pen registers on ROBERTSON's cellular telephone [(XXX) XXX-XXXX] investigators located a telephone number of [(XXX) XXX-XXXX] in contact with ROBERTSON's telephone approximately 685 times from November 5, 2025 through December 30, 2025. [(XXX) XXX-XXXX] has a CashApp account with a display name of [N.H.] and a unique identifier of "XXXXXXXXXXXXX." Based on the above information, it is believed ROBERTSON and [N.H.] are close associates and ROBERTSON frequents this address.

On December 30, 2025, a federal arrest warrant was issued in the Northern District of Iowa for ROBERTSON for Distribution of a Controlled Substance [Title 21 USC 841 (a) (1)].

On 12/20/25 at 0052hrs dispatch received multiple 911 calls of a shooting at Green Gable bar. Officers arrived on scene and located the shooting victim inside the bar and began medical treatment. Victim was ultimately identified as [P.J.].

Investigator Carton attempted to interview with [P.J.] at St. Lukes. [P.J.] was cooperative and refused to provide a story stating "Jesus will take care of everything[.]" [P.J.] stated he did not want to seek prosecution against whomever shot him.

[P.J.] was shot in the buttocks and had surgery and is currently living with his mother [L.J.].

Investigations through surveillance video from the Green Gable identified the shooter as Antonio Robertson DOB: [XX/XX/XXXX]. Antonio has an active Federal arrest warrant for narcotics.

This Investigator reviewed numerous videos from Green Gable dated 12/20/2025 at approximately 0051 hours.

Prior to the shooting, [P.J.] can be seen on video observing Roberston enter the Pool Room of the Green Gable, it appears he is going to confront Robertson but decides to go outside with an unknown male. [P.J.] can be seen on an outside camera speaking with two other individuals, one of these subjects place a facemask on and enters the bar through a side door. Both [P.J.] and the unknown male he walks outside with reenter and approach Robertson. Within a minute from being confronted, Robertson retrieves a handgun from his waistband and chases James downstairs from the pool room to the bar area. [P.J.] is seen falling on the bar floor followed by Antonio Robertson. The video shows Robertson standing over [P.J.] and firing once. It appears after the Robertson shoots [P.J.] he reaches down and takes something from [P.J.] and then exits the north main bar door. Reviewing different video cameras inside the Green Gable, it is this Investigator's opinion that this object appears to be a black handgun due to the shape and size of this object. Video also shows what appears to be a handgun magazine near [P.J.] lying on the ground. An unknown bar patron uses his foot to drag this magazine away from the area and picks it up.

Investigator Liddle was assigned a shooting that took place in the 1500 block of 1st Ave NE. Inv. Liddle advised that Antonio was the intended target with [P.J]. being the suspect. Inv. Liddle investigated this and through a search warrant located conversation between Robertson and [P.J.], where [PJ] owed Robertson money. Robertson threatened to burn [P.J.'s] Mother's house down if he did not receive his money. . . .[9]

[9] Paragraphs 15-20 of Inv. Bell's affidavit is not reproduced here because paragraphs 15-20 are identical to paragraphs 8-13 of the affidavit. No explanation has been offered for this repetition.

> Your Affiant reviewed video that observes Antonio Robertson arriving in a blue Jaguar by himself, he walks into the Green Gable through the J Ave side door at 0048 hours and walks up to the Pool Room. It appears that Roberston is wearing a blue colored sweatshirt with a large design of a face with stars over the eyes wearing a red hat. Robertson is also wearing blue jeans, a dark colored ball cap and black and white high top tennis shoes. After the shooting Robertson can be seen exiting the Green Gable, enters the blue Jaguar and drives southbound through the alley.
>
> Video shows another male, believed to be [Q.S.], exit the Green Gable after the shooting and runs to a vehicle parked on J Ave, he seen opening the door, and running towards the alley where Robertson is fleeing down, and gun shots can be seen being fired from [Q.S.] towards the blue Jaguar.
>
> On 12/30/25, following an arrest of Antonio Robertson at [XXXX] K St. SW[.]
>
> On 12/02/2025, Investigators observed Antonio Robertson exit [XXXX] K St. and enter and drive a blue Jaguar XJL with Dealer plates [XXXXX-XXX].
>
> On 12/30/2025, Investigators observed a blue Jaguar XJL parked in the rear of [XXXX] K St. SW, however the dealer tag is no longer on it.
>
> On 12/30/2025, a search warrant for [XXXX] K St. SW was executed where Antonio Robertson was located and arrested on the above Distribution of Controlled Substance complaint.
>
> Based on your Affiant's investigation, a search warrant is requested for [XXXX] K St. SW to locate clothing, handguns, ammunitions (sic), involved in the shooting of [P.J.] at the Green Gable.

(Def. Ex. C, Doc. 41-4 at 4-7.)

At the hearing, Inv. Bell explained that in his experience of working multiple shooting cases, that after a shooting, the shooter will typically go some place other than their residence and "hang low, stay low." (Bell Hr'g Test. at 94.) Similarly, Inv. Brand testified that throughout the surveillance, Defendant was not seen at the address listed on

his driver's license "quite as much." (Brand Hr'g Test. at 54.) Inv. Bell also stated that he knew both Defendant and P.J. had histories of drug activity and in his experience such individuals are less worried about police coming to find them and more worried about retaliation; and therefore, such individuals are likely to keep firearms[10] with them for protection. (Bell Hr'g Test. at 94.) Further, Inv. Bell testified that in his training and experience, it is common for individuals involved in shootings to remain armed and keep firearms on their person or near to them for protection from potential retaliation. (*Id.* at 91-92.) After obtaining the search warrant, law enforcement executed the search warrant and found three handguns and a blue sweatshirt consistent with the clothing Defendant was wearing at the Green Gable. (*Id.* at 97.)

## *III. DISCUSSION*

### *A. The Parties' Arguments*

Defendant argues that he was not speeding when he was stopped by law enforcement on July 25, 2025. (Doc. 41-1 at 3.) Defendant maintains that "[b]ecause law enforcement lacked probable cause to believe the Defendant committed a moving violation, and because law enforcement otherwise lacked grounds to seize the vehicle, it was an unreasonable search under the Fourth Amendment." (*Id.*)

Defendant also argues that Inv. Bell's search warrant "fails the probable cause requirement." (*Id.* at 4.) Specifically, Defendant argues that search warrant application "fails to explain why police believed that there might be any evidence in the residence." (*Id.*) Defendant maintains that "the affidavit contains no reason to believe that law enforcement would find 'clothing, handguns, ammunitions (sic), involved in the shooting' belonging to the Defendant at the residence." (*Id.*) Defendant points out that he was not

[10] Specifically, Inv. Bell stated that he "felt in my heart that where he was going, where he's at, he's going to have—the gun that he used in the shooting at the Green Gable would still be with him for protection." (Bell Hr'g Test. at 94-95.)

residing at the K Street residence and was merely a visitor meaning "a suspect's mere presence or arrest at a residence alone is insufficient to establish probable cause to search that residence." (*Id.* at 5.) Defendant argues that:

> The Defendant's earlier arrest at 1209 K St. SW, even when considered alongside his previous sighting at the house and his phone communications with a number associated with a resident of the address, did not establish probable cause that contraband belonging to the Defendant would be found there. Law enforcement had no evidence tracing the guns to the residence—only a suspicion that the Defendant was living there and storing contraband there. Given the lack of support for law enforcement's belief that the Defendant was storing contraband at the residence, the search warrant affidavit did not adequately establish why the residence might contain evidence of criminal activity belonging to the Defendant.

(*Id.*)

Finally, Defendant argues that the *Leon* "good faith exception does not apply." (*Id.* at 6.) Defendant relies on the third *Leon* factor—the affidavit in support of the warrant is so lacking in indicia of probable cause that to render belief in the existence of probable cause is unreasonable. Defendant asserts that the "state judge granted the search warrant even though [Inv.] Bell's application affidavit simply described the crime along with the Defendant's tenuous connections to [XXXX] K St. SW." (*Id.* at 7.) Defendant maintains that "the affidavit in the Defendant's case did not connect the residence with evidence of the shooting, and law enforcement could not have objectively believed there was such a nexus." (*Id.*) Defendant concludes that:

> The affidavit also did not offer any facts suggesting why the Defendant was likely to still have evidence from the shooting at the residence ten days after the incident. The affidavit consisted of mere hope that evidence would be found at the residence; its conclusory allegations did not provide even an indicia of probable cause to justify granting a search warrant.

(*Id.*)

The Government argues that the "July 25, 2025 traffic stop was supported by probable cause." (Doc. 49-1 at 8.) The Government maintains that because law enforcement "was able to determine that defendant's vehicle was traveling 42 miles per hour in a 35 miles per hour zone," law enforcement "had probable cause to pull over defendant's vehicle because defendant's vehicle was exceeding the posted speed limit." (*Id.* at 9.) Alternatively, the Government argues that the "July 25, 2025 traffic stop was supported by reasonable suspicion." (*Id.*) The Government points out that law enforcement received a tip from a CS[11] that Defendant was traveling to Chicago to obtain methamphetamine and heroin and Defendant's location when he returned to Cedar Rapids. (*Id.* at 11.) Further, the Government notes that using Flock camera alerts, law enforcement was able to corroborate the CS's information by Defendant's vehicle making a trip consistent with the CS's information, Defendant's return to Cedar Rapids, and Defendant's location at a storage unit, also consistent with the CS's information. (*Id.*) The Government asserts that based on the CS's corroborated information, "officer's had reasonable suspicion to stop defendant's vehicle." (*Id.*)

The Government also argues that the K Street search warrant was supported by probable cause. (*Id.* at 12.) Specifically, the Government argues that:

> In this case, the information contained in the four corners of the search warrant supported Judge Johnston's decision to issue the warrant. The information included in the affidavit linked defendant to the shooting just ten days earlier and the possession of at least one firearm. Video surveillance from the Green Gable showed defendant arriving in a blue Jaguar, shooting the victim in the bar before taking what appeared to be a gun from the victim, and then exiting the bar and driving away in the blue Jaguar.
>
> The information in the affidavit also linked defendant to [XXXX] K Street Southwest. First, defendant was observed at the residence by law

[11] At certain points, the Government references a "CI" instead of a "CS." (Doc. 49-1 at 11.) However, there appears to be only one person who provided confidential information. For clarity, I will use "CS" throughout.

> enforcement during surveillance on December 2, 2025, and again on December 30, 2025, at the time of his arrest. Second, on December 2, 2025, investigators observed defendant driving two vehicles that were located at the residence, including a Jaguar and a Genesis rental vehicle that had been rented under defendant's name. Third, through the use of a pen register, investigators learned that defendant had approximately 685 contacts between November 5, 2025, and December 30, 2025, with [NH], the woman associated with the residence. Based on the physical surveillance from December 2, 2025, and the approximately 685 phone contacts, Investigator Bell wrote in the affidavit "it is believed ROBERTSON and [N.H.] are close associates and ROBERTSON frequents this address." Fourth, video surveillance from the Green Gable showed defendant leaving the bar in a blue Jaguar after shooting the victim and taking what appeared to be a gun from the victim. Just ten days later, officers observed a blue Jaguar at [XXXX] K Street Southwest when they were there to execute the federal arrest warrant and the first search warrant.
>
> Based on the totality of the information in the affidavit, it is not an unreasonable inference that evidence of the shooting that defendant was involved in just ten days earlier would be found at [XXXX] K Street Southwest. Investigator Bell's affidavit in support of the search warrant for [XXXX] K Street Southwest contained sufficient facts to establish a fair probability that contraband would be discovered there.

(*Id.* at 16-17.)

Finally, the Government argues that "[e]ven if the Court finds that the residence search warrant lacked probable cause, the *Leon* good-faith exception to the exclusionary rule applies." (*Id.* at 20.) The Government asserts that "the search warrant was signed by an experienced judge who was aware of the facts of the investigation and had knowledge of criminal law, warrants, and the probable-cause standard. It was objectively reasonable for officers to rely on the judge's assessment." (*Id.* at 23.) The Government also contends that "[t]he information presented in the affidavit and the additional facts known by officers were not 'so lacking in indicia of probable cause as to render official

belief in its existence entirely unreasonable.'" (*Id.* at 23-24) (quoting *United States v. Leon*, 468 U.S. 897, 923 (1984)).

### *B. The Traffic Stop*

#### *1. Relevant law*

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. "The Fourth Amendment prohibits unreasonable searches and seizures by the Government, and its protections extend to brief investigatory stops of persons or vehicles that fall short of traditional arrest." *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (citing *United States v. Cortez*, 449 U.S. 411, 417 (1981); *Terry v. Ohio*, 392 U.S. 1, 9 (1968)) (internal quotations omitted). "A traffic stop constitutes a seizure for purposes of the Fourth Amendment and therefore must be supported by probable cause or reasonable suspicion." *United States v. Givens*, 763 F.3d 987, 989 (8th Cir. 2014) (citing *United States v. Hollins*, 685 F.3d 703, 705-06 (8th Cir. 2012)). Officers may only conduct investigatory stops if they have reasonable suspicion that criminal activity may be afoot. *United States v. Patrick*, 776 F.3d 951, 954 (8th Cir. 2015).

"A law enforcement officer may conduct an investigative stop of a vehicle when he [or she] has 'a particularized and objective basis for suspecting the particular person stopped of criminal activity.'" *United States v. Pounds*, 70 F.4th 1106, 1108 (8th Cir. 2023) (quoting *United States v. Cortez*, 449 U.S. 411, 417-18 (1981)); *see also United States v. Fields*, 832 F.3d 831, 834 (8th Cir. 2016) ("A police officer 'may, consistent with the Fourth Amendment, conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot.'") (Quoting *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000)). Courts consider the "totality of the circumstances to determine whether an officer has a particularized and objective basis to suspect

wrongdoing." *Pounds*, 70 F.4th at 1108 (citing *Arvizu*, 534 U.S. at 273). "When a team of law enforcement officers is involved in an investigation, the issue is whether all the information known to the team provided 'specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant' the investigative stop." *United States v. Collins*, 883 F.3d 1029, 1032 (8th Cir. 2018) (per curiam) (quoting *United States v. Winters*, 491 F.3d 918, 921 (8th Cir. 2007), in turn quoting *United States v. Robinson*, 119 F.3d 663, 666 (8th Cir. 1997)).

In the context of traffic violations, a police officer may stop a vehicle only when the officer has "'at least a reasonable, articulable suspicion that criminal activity has occurred or is occurring,' and 'a traffic violation—however minor—creates probable cause to stop the driver of a vehicle.'" *United States v. Cox*, 992 F.3d 706, 709 (8th Cir. 2021) (quoting *United States v. Martin*, 411 F.3d 998, 1000 (8th Cir. 2005)). Generally, a traffic stop "is reasonable where the police have probable cause to believe that a traffic violation has occurred." *Whren v. United States*, 517 U.S. 806, 810 (1996). A minor traffic violation is sufficient to establish probable cause for an officer to conduct a traffic stop even if the stop is pretext for another investigation. *United States v. Sallis*, 507 F.3d 646, 649 (8th Cir. 2007) (quoting *United States v. Coney*, 456 F.3d 850, 855-56 (8th Cir. 2006)). An officer's actual motivation for making the stop beyond simply issuing a traffic violation is irrelevant provided that the officer has an objectively good reason for making the stop. *Id*.

Additionally, "[r]easonable suspicion may be based on an informant's tip where the tip is both reliable and corroborated." *United States v. Bell*, 480 F.3d 860, 863 (8th Cir. 2007) (citing *Adams v. Williams*, 407 U.S. 143, 147 (1972); *United States v. Jacobsen*, 391 F.3d 904, 906 (8th Cir. 2004)); *see also United States v. Winborn*, 111 F.4th 910, 912 (8th Cir. 2024) ("A reliable witness's tip can provide reasonable suspicion to make an investigatory stop.") (Citing *Navarette v. California*, 527 U.S. 393, 399-400

(2014); *United States v. Mosely*, 878 F.3d 246, 252-53 (8th Cir. 2017)). The Eighth Circuit has held that, "[t]hough less reliable than informants with a proven record, unproven informants are more reliable than anonymous tipsters because the police can hold them responsible for false information." *United States v. Kent*, 531 F.3d 642, 648 (8th Cir. 2008). In general, the reasonable suspicion standard "is 'less demanding' than probable cause and much lower than preponderance of the evidence." *United States v. Callison*, 2 F.4th 1128, 1132 (8th Cir. 2021) (citing *Wardlow*, 528 U.S. at 123). In *Alabama v. White*, 496 U.S. 325 (1990), the Supreme Court explained that:

> Reasonable suspicion is a less demanding standard than probable cause not only in the sense that reasonable suspicion can be established with information that is different in quantity or content than that required to establish probable cause, but also in the sense that reasonable suspicion can arise from information that is less reliable than that required to show probable cause. *Adams v. Williams* . . . demonstrates as much. We there assumed that the unverified tip from the known informant might not have been reliable enough to establish probable cause, but nevertheless found it sufficiently reliable to justify a *Terry* stop. 407 U.S. at 147. . . . Reasonable suspicion, like probable cause, is dependent upon both the content of information possessed by police and its degree of reliability. Both factors—quantity and quality—are considered in the "totality of the circumstances—the whole picture," *United States v. Cortez*, 449 U.S. 411, 417, 101 S.Ct. 690, 695, 66 L.Ed.2d 621 (1981), that must be taken into account when evaluating whether there is reasonable suspicion. Thus, if a tip has a relatively low degree of reliability, more information will be required to establish the requisite quantum of suspicion than would be required if the tip were more reliable.

*White*, 496 U.S. at 330.

Furthermore, "[t]he collective knowledge of law enforcement officers conducting an investigation is sufficient to provide reasonable suspicion, and the collective knowledge can be imputed to the individual officer who initiated the traffic stop when there is some communication between the officers." *United States v. Rederick*, 65 F.4th

961, 966 (8th Cir. 2023) (quoting *United States v. Thompson*, 533 F.3d 964, 969 (8th Cir. 2008)); *see also United States v. Jacobsen*, 391 F.3d 904, 907 (8th Cir. 2004) ("The patrol officer himself need not know the specific facts that caused the stop . . . [r]ather, the officer need only rely upon an order that is founded on reasonable suspicion.").

***2. Application***

In his brief, Defendant simply states "[t]he Defendant denies law enforcement's claim that he was speeding." (Doc. 41-1 at 3.) Defendant offers no evidence to support this assertion. At the hearing, Defendant attempted to discredit the practice of ascertaining the relative speed of moving vehicles by "pacing." Defense counsel elicited testimony confirming that: (1) Officer Pfiffner did not receive training on pacing at the Cedar Rapids Regional Police Academy; (2) Officer Pfiffner had never been tested on his pacing accuracy; (3) pacing is less accurate than radar and lidar; (4) Officer Pfiffner did not know whether his patrol car's speedometer was calibrated on July 25, 2025; (5) Officer Pfiffner did not know the amount of tire tread wear[12] on his vehicle on July 25, 2025; (6) there are no national standards or CRPD standards for pacing; and (7) Officer Pfiffner has never passed a foot-eye test.[13] (Pfiffner Hr'g Test. at 69-77.) While defense counsel's cross-examination probed interesting territory, Defendant offers no evidence: (1) Officer Pfiffner's patrol vehicle's speedometer was not properly calibrated on July 25, 2025; (2) what the actual tread on the patrol vehicle was on July 25, 2025; (3) national standards on pacing even exist; and (4) Officer Pfiffner could not pass an eye-foot test.

---

[12] Defendant's theory is that a speedometer measures tire rotations and "when the tire tread gets worn away and the tire diameter gets more narrow, the tire rotations increase, which can cause the car to think it's traveling faster than it actually is. (Pfiffner Hr'g Tr. at 73.) Officer Pfiffner did not disagree with this theory. (*Id.* at 73-74.)

[13] Defendant's "foot-eye" test, if it exits, would presumably test whether a patrol officer could reliably measure the distance to the subject vehicle (i.e., the eye part) while maintaining a steady speed of the patrol car (i.e., the foot part).

Moreover, Defendant cites no authority regarding requirements for police officers to have specialized training in pacing or requirements that officers be tested on pacing. Officer Pfiffner testified that based on pacing he determined that Defendant was driving 42 miles-per-hour in a 35 miles-per-hour zone. From 22:36:18 to 22:36:35 the dashcam video shows the patrol vehicle pace Defendant's vehicle between 35 miles-per-hour and 43 miles-per-hour. Defendant's cross-examination hints at the sort of concerns regarding the admissibility of scientific testimony that arise under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) but never directly challenges the admissibility or reliability of pacing. I note that the recorded evidence from the dashboard camera shows the patrol car's speed and the video corroborates the conclusion that the vehicles were traveling at the same speed. If the evidence showed Defendant traveling at 1 or 2 miles over and/or the video showing the pacing was less definitive, Defendant might have a point. However, at 42 miles per hour, the vehicles were traveling at 120% of the posted speed limit. I have little concern that any margin of error or lack of calibration evidence regarding the patrol car's speedometer undermines the officer's basis for the stop. I found Officer Pfiffner credible. Moreover, Government Exhibit 4 corroborates Officer Pfiffner's testimony. Accordingly, I find that law enforcement had probable cause to stop Defendant for speeding. *See Whren*, 517 U.S. at 810; *Cox*, 992 F.3d at 709; *Sallis*, 507 F.3d at 649. Thus, I recommend that Defendant's motion to suppress be denied on the issue of the traffic stop.

Alternatively, Inv. Brand received several tips from the CS, which included: (1) Defendant leaving Cedar Rapids for Chicago to obtain methamphetamine and heroin; (2) the approximate time Defendant was leaving for Chicago; (3) Defendant's license plate number; and (4) Defendant's location after returning to Cedar Rapids. (Brand Hr'g Test. at 7-8, 12.) The CS's information was corroborated by the license plate number belonging to a 2010 silver Dodge Charger that was registered to Defendant and Flock

camera hits on the Dodge Charger in Peru, Illinois and returning to Cedar Rapids. Also, Defendant's vehicle after it returned to Cedar Rapids was located where the CS informed law enforcement that it would be located. (*Id.* at 8-9, 11-12.)

Defendant does not address the tips from the CS in his brief. At the hearing, Defendant minimally addressed evidence about the CS and made no direct argument regarding the CS's unreliability. Defense counsel elicited testimony from Inv. Brand that the CS initially registered as an informant in September 2023 to cooperate with law enforcement, however, the CS's charges were dropped, and no cooperation occurred at that time. The CS did not register as an informant again until July 25, 2025. Also, prior to July 2025, the CS had never provided information used in a search warrant or used to recover any contraband. The CS also had a criminal history which included forgery, possession of a controlled substance, and possibly theft. (*Id.* at 22-24.)

"Though less reliable than informants with a proven record, unproven informants are more reliable than anonymous tipsters[.]" *Kent*, 531 F.3d at 648. While unproven, the CS's information was corroborated by law enforcement. Thus, to the extent that Defendant may question the CS's reliability, I find that, based on the totality of the circumstances, in this instance, the CS was reliable and the information provided was corroborated. *See Bell*, 480 F.3d at 863 ("Reasonable suspicion may be based on an informant's tip where the tip is both reliable and corroborated"); *Winborn*, 111 F.4th at 912 ("A reliable witness's tip can provide reasonable suspicion to make an investigatory stop."). Further, Officer Pfiffner testified that he was informed of the CS's tip and knew that narcotics investigators believed Defendant was in possession of a large amount of narcotics. (Pfiffner Hr'g Test. at 61-62.)

Accordingly, I find that based on the totality of the circumstances, particularly the CS's information, Officer Pfiffner and his partner had reasonable suspicion to believe Defendant was in possession of narcotics to conduct an investigatory stop on Defendant's

vehicle. *See Pounds*, 70 F.4th at 1108 ("A law enforcement officer may conduct an investigative stop of a vehicle when he [or she] has a particularized and objective basis for suspecting the particular person stopped of criminal activity") (quotation omitted)); *see also Rederick*, 65 F.4th at 966 ("The collective knowledge of law enforcement officers conducting an investigation is sufficient to provide reasonable suspicion, and the collective knowledge can be imputed to the individual officer who initiated the traffic stop when there is some communication between the officers."). Therefore, I recommend that Defendant's motion to suppress be denied regarding the evidence derived from the traffic stop.

***C. Defendant's Statements***

In his motion, Defendant also states that he seeks to suppress "any statements which followed the unconstitutional intrusion into his vehicle." (Doc. 41.) However, in his Brief in Support of Motion to Suppress, Defendant makes no mention of statements to be suppressed, offers no argument on the issue of suppressing statements, and identifies no statements he seeks to suppress, much less describe when or where such statements were made. (Doc. 41-1.) My Standing Order for Suppression Hearings, issued October 22, 2020, requires that the "inventory shall specify any statements sought to be suppressed by participants' names, date, and location." At the hearing, defense counsel stated that "I had included in my motion to suppress statements to be suppressed. I did not identify those statements very well, which I apologize[.]" (Hr'g Tr. at 125.) Further, defense counsel stated that Defendant "did make statements to law enforcement on July 25th after the traffic stop back at the Cedar Rapids police station. And those are the statements that I referenced, albeit pretty poorly in my motion to suppress." (*Id.* at 126.) The Government objected based on lack of specificity of the alleged statements to be suppressed and lack of evidence introduced to the Court at the instant hearing. (*Id.* at 127.) The Government stated "[w]e would have to schedule another hearing if,

ultimately, the Court wants to entertain that argument." (*Id.*) I told the parties that "I don't intend to set another hearing or hear more evidence about those statements." (*Id.* at 127.) I further stated that "I don't know what I can do with the—those statements. I don't know what they were . . . when they were made, so I, I guess I'm likely to say that you've waived arguments with respect to those[.]" (*Id.* at 126.) I concluded that the with regard to the alleged statements "it seems legally those are going to be—not going to be suppressed because the record on them is inadequate." (*Id.* at 127.) Given that no specific statements were identified and the issue was not briefed, I find the issue waived.

Additionally, in the very brief discussion of the statements at Doc. 41, Defendant states, "All evidence from either incident was obtained as a result of an unreasonable search or is a fruit of the poisonous tree from such search." Taking this statement at face value, I note that Defendant's sole objection to the admission of his statements is that they resulted from the alleged unreasonable search following the traffic stop. Because there was no unreasonable search, as discussed above, there is no basis to suppress Defendant's statements.

### *D. The Search Warrant for the K Street Residence*

#### *1. Relevant law*

"The Warrant Clause of the Fourth Amendment requires that warrants (1) be issued by a neutral and detached magistrate, (2) contain a 'particular[ ] descri[ption of] the place to be searched, and the persons or things to be seized,' and (3) be based 'upon probable cause, supported by Oath or affirmation.'" *United States v. Skarda*, 845 F.3d 370, 375 (8th Cir. 2016) (quoting *United States v. Clyburn*, 24 F.3d 613, 617 (4th Cir. 1994), in turn quoting U.S. Const. amend. IV). "A magistrate judge may issue a search warrant 'upon a showing of probable cause to believe that the legitimate object of a search is located in a particular place.'" *Skarda*, 845 F.3d at 376 (quoting *Steagald v. United States*, 451 U.S. 204, 213, 101 S.Ct. 1642, 68 L.Ed.2d 38 (1981)). "Probable cause

exists when, viewing the totality of the circumstances, 'there is a fair probability that contraband or evidence of a crime will be found in a particular place.'" *United States v. Reed*, 921 F.3d 751, 757 (8th Cir. 2019) (quoting *Illinois v. Gates*, 462 U.S. 213, 230, 238 (1983)); *see also United States v. Evans*, 4 F.4th 633, 636 (8th Cir. 2021) ("Probable cause is a fair probability that . . . evidence of a crime will be found in the location to be searched") (quoting *United States v. LaMorie*, 100 F.3d 547, 552 (8th Cir. 1996))). "In assessing whether a warrant is sufficiently particular, [courts] consider the purpose for which the warrant was issued, the nature of the items to which it is directed, and the total circumstances surrounding the case." *United States v. Ivey*, 91 F.4th 915, 918 (8th Cir. 2024) (citation omitted).

The particularity requirement "is one of 'practical accuracy rather than a hypertechnical one.'" *Id.* (quoting *United States v. Schave*, 55 F.4th 671, 675 (8th Cir. 2022)). "Common sense" drives the inquiry into whether probable cause exists, and the ultimate determination cannot be "readily, or even usefully, reduced to a neat set of legal rules." *Illinois v. Gates*, 462 U.S. 213, 231-32 (1983). "'[T]his practical and common-sensical standard' is based on 'the totality of the circumstances.'" *United States v. Zamora-Garcia*, 831 F.3d 979, 983 (8th Cir. 2016) (alteration in original) (quoting *Florida v. Harris*, 568 U.S. 237, 244 (2013)).

It is not this Court's place to determine whether affidavits supporting search warrants are supported by probable cause. "[A]fter-the-fact scrutiny by courts of the sufficiency of an affidavit should not take the form of *de novo* review. A magistrate's determination of probable cause should be paid great deference by reviewing courts." *Gates*, 462 U.S. at 236 (citation and internal quotation marks omitted); *see also United States v. Hallam*, 407 F.3d 942, 948 (8th Cir. 2005) ("In reviewing the issuance of a warrant, a district court need not make a *de novo* inquiry into the existence of probable cause."). "The Fourth Amendment requires that the issuing 'magistrate had a substantial

basis for concluding that a search would uncover evidence of wrongdoing.'" *United States v. Maccani*, 49 F.4th 1126, 1130 (8th Cir. 2022) (quoting *Gates*, 462 U.S. at 236); *see also United States v. Johnson*, 848 F.3d 872, 876 (8th Cir. 2017) ("The role of a reviewing court is to ensure the magistrate issuing the warrant 'had a "substantial basis for concluding that probable cause existed"'") (quoting *United States v. Colbert*, 828 F.3d 718, 726 (8th Cir. 2016), in turn quoting *United States v. Garcia-Hernandez*, 682 F.3d 767, 771 (8th Cir. 2012))). "When the issuing magistrate relies solely on a supporting affidavit in determining probable cause, . . . 'only that information which is found within the four corners of the affidavit may be considered in determining the existence of probable cause.'" *United States v. Saddler*, 19 F.4th 1035, 1039 (8th Cir. 2021) (quoting *United States v. Roberts*, 975 F.3d 709, 713 (8th Cir. 2020)). "The issuing court's probable cause determination 'should be paid great deference by reviewing courts.'" *Johnson*, 848 F.3d at 876 (quoting *United States v. Brewer*, 588 F.3d 1165, 1170 (8th Cir. 2009)).

The substantial basis standard requires that the issuing judge "make a practical and common-sense" determination, based only on the circumstances set forth in the affidavit, that the totality of the circumstances point to "a fair probability that contraband or evidence of a crime will be found in a particular place." *United States v. Kail*, 804 F.2d 441, 444 (8th Cir. 1986) (quoting *Gates*, 462 U.S. at 238). "Not only may an issuing judge 'draw reasonable inferences from the totality of the circumstances in determining whether probable cause exists to issue a warrant, . . . law enforcement officers may make reasonable inferences in preparing affidavits in support of a warrant.'" *United States v. Brackett*, 846 F.3d 987, 992 (8th Cir. 2017) (quoting *United States v. Thompson*, 210 F.3d 855, 860 (8th Cir. 2000)). "[T]here is no requirement that an affiant have first-hand knowledge of every allegation he includes in his affidavit." *United States v. Fiorito*, 640 F.3d 338, 346 (8th Cir. 2011). Conclusory statements, however, "made by affiants

fail to give the issuing magistrate a substantial basis for determining probable cause exists." *United States v. Summage*, 481 F.3d 1075, 1077-78 (8th Cir. 2007). "In addition to probable cause that contraband or evidence of a crime will be found, 'there must [also] be evidence of a nexus between the contraband and the place to be searched.'" *United States v. Randle*, 39 F.4th 533, 536 (8th Cir. 2022) (quoting *United States v. Tellez*, 217 F.3d 547, 550 (8th Cir. 2000)). This requires "'a "nexus" between the evidence to be seized and the place to be searched, considering "the nature of the crime and the reasonable, logical likelihood of finding useful evidence."'" *Schave*, 55 F.4th at 676 (quoting *United States v. Smith*, 21 F.4th 510, 515 (8th Cir. 2021), in turn quoting *United States v. Johnson*, 848 F.3d 872, 878 (8th Cir. 2017)).

Defendant bears the burden of proving the warrant was issued without probable cause. *See Carter v. United States*, 729 F.2d 935, 940 (8th Cir. 1984) ("As a general rule, the burden of proof is on the defendant who seeks to suppress evidence") (citing *United States v. Phillips*, 540 F.2d 319 (8th Cir. 1976)); *United States v. McGuire*, No. CR 13-40058, 2013 WL 5516192, at *3 (D.S.D. Oct. 1, 2013) ("A movant seeking to suppress evidence under a regularly issued warrant has the burden to show that the warrant was issued without probable cause") (quoting *United States v. Sierra–Garcia,* 760 F. Supp. 252, 262 (E.D.N.Y. 1991)), *R. & R. adopted,* 2013 WL 6449893 (D.S.D. Dec. 10, 2013). "In doubtful or marginal cases, the resolution of the Fourth Amendment question should be determined to a large extent by the preference accorded to searches based upon warrants." *United States v. Leichtling*, 684 F.2d 553, 555 (8th Cir. 1982) (quoting *United States v. Christenson*, 549 F.2d 53, 55 (8th Cir. 1977)); *see also United States v. Ventresca*, 380 U.S. 102, 109 (1965) ("Although in a particular case it may not be easy to determine when an affidavit demonstrates the existence of probable cause, the resolution of doubtful or marginal cases in this area should be largely determined by the preference to be accorded to warrants.").

### *2. Application*

The warrant application expressly requested permission to search the K Street residence for clothing, including a blue-colored sweatshirt with a large design of a face with stars over the eyes wearing a red hat, blue jeans, dark colored cap, and black and white high-top tennis shoes, firearms, ammunition, DNA, photos, cell phones, and any and all electronic storage media devices. (Def. Ex. C) (Doc. 41-4 at 8.) Inv. Bell checked that these items are "[p]roperty that has been obtained in violation of the law," "[p]roperty, the possession of which is illegal," "[p]roperty used or possessed with the intent to be used as a means of committing a public offense or concealed to prevent an offense from being discovered," and "[p]roperty relevant and material as evidence in a criminal prosecution." (Def. Ex. C) (Doc. 41-4 at 2.) In summary, the affidavit sets forth the following:

a. A DEA and CRPD drug investigation identified Defendant as being involved in drug distribution.

b. On December 2, 2025, DEA investigators surveilling the K Street residence observed a gray Genesis GV80 vehicle rented to Defendant.

c. On December 2, 2025, during the DEA surveillance of the K Street residence, agents observed Defendant entering and exiting the residence. They also observed Defendant operating the Genesis and the Jaguar near the residence. Additionally, precision location data from Defendant's phone showed Defendant's cell phone in the area of the residence when he was observed at the residence.

d. From November 5, 2025 through December 30, 2025, a pen register on Defendant's phone showed 685 texts between Defendant and N.H., who lived at the K Street residence.

e. On December 30, 2025, a federal arrest warrant was issued for Defendant.

f. Surveillance from a shooting at the Green Gable Inn showed Defendant to be the shooter.

g. The surveillance video showed Defendant appearing to take a handgun from P.J. after Defendant shot P.J.

h. Inv. Bell reviewed video from the Green Gable showing Defendant arriving and leaving in the same blue Jaguar.

i. On December 2, 2025, Defendant was observed leaving the K Street residence and entering and driving the blue Jaguar.

j. On December 30, 2025, the blue Jaguar was observed parked in the rear of the K Street residence.

k. On December 30, 2025, a search warrant for the K Street residence to locate Defendant was executed and Defendant was found at the residence and arrested on the federal arrest warrant.

(Def. Ex. C.)

Defendant asserts that he was not residing at the K Street residence, but "merely visiting." (Doc. 41-1 at 4.) Defendant notes that if he was "actually residing there, it is unlikely that he would have to communicate by phone with another resident as frequently as established in the search warrant affidavit." (*Id.*) While Defendant's assertion may have some initial appeal, it does not withstand much scrutiny. If people are living together, Defendant seems to suppose, they would have little need to communicate by text because they are more likely to be in the same room together. It is, however, equally plausible that among someone's most frequently texted phone contacts would be a person with whom they live. There was no evidence on the issue, but it is not a stretch to conclude that people who live together text one another about groceries, plans, rides,

childcare, and a myriad of other issues. By itself, evidence of 685 texts in less than 60 days does not confirm that the participants in the communication are living together. Nevertheless, as part of a composite picture of Defendant's possible connection to the K Street residence, this communication is significant. Put another way, the 685 text messages do not establish Defendant was residing at the K Street residence. However, the large number of messages establishes Defendant's connection to the residence which the issuing judge was justified in considering in determining whether there was probable cause. Here, the large number of text messages could well support the issuing judge's determination of probable cause.

Further, relying on *Hummel-Jones v. Strope*, 25 F.3d 647 (8th Cir. 1994), Defendant argues that "'[w]hile possession of a warrant generally justifies searching the effects of those occupying the premises . . . special Fourth Amendment concerns arise when the persons on the premises are visitors.'" (Doc. 41-1 at 5) (alteration in original) (quoting *Hummel-Jones*, 25 F.3d at 651). *Hummel-Jones* is distinguishable. In *Hummel-Jones* law enforcement was investigating a rural alternative birthing clinic operated by a registered nurse for "concern that the nurse might be practicing medicine without a license." 25 F.3d at 649. On January 23, 1991, at 10:00 p.m. a couple (the plaintiffs in this § 1983 action) with their toddler and four-hour newborn baby were the only people at the clinic. An off-duty deputy claiming to have car trouble knocked on the door of the clinic and the couple let him in to use the phone. The deputy called other law enforcement officers to inform them that the clinic was occupied by a family with a newborn infant. At 11:00 p.m. law enforcement obtained a search warrant for the clinic. The Eighth Circuit described that search warrant affidavit and subsequent issuing of the search warrant as follows:

> The affidavit was not only conclusory in nature, it also neglected to inform the magistrate that the "confidential informant" with information of a birth was an off-duty deputy impersonating a United States serviceman on his

> way to war and that a family with an hours-old newborn was occupying the clinic. The magistrate issued the warrant at approximately 1:00 A.M., and authorized a search for "video tapes, medical records, medical supplies, financial records, video equipment, medications or narcotics, sheets, [and] medical textbooks" being kept at the [clinic].

*Id.* Officers executed the search warrant at 2:00 a.m. The Eighth Circuit described the search in pertinent part as follows:

> The searchers seized the couple and restricted them to the waiting room couch while the search was conducted. Whenever Hummel–Jones left the couch, an officer accompanied her. Inspector Kistler photographed the family as "evidence." Kistler also photographed Hummel–Jones's lingerie soaking in the bathroom sink. Popplewell searched Hummel–Jones's overnight bag against her wishes. The searchers seized one of the family's banking slips to establish their identity. The searchers also seized the couple's personal video-tape of Hummel–Jones's afterbirth experience, despite the couple's objections. The search lasted for three and a half hours, or, essentially, throughout the night. The searchers permitted the family to use the bathroom and telephone, and Hummel–Jones was allowed to nurse her infant.

*Id.* at 649-50. The Eighth Circuit concluded that the search and seizure involving the couple was unreasonable:

> Here, the couple was merely patronizing the clinic when the search was executed. In an analogous situation, the Supreme Court held that patrons of a bar could not be searched even though officers had a warrant to search the bar for heroin. *Ybarra* [*v. Illinois*], 444 U.S. [] 85, 100 S.Ct. [] 339 [(1979)]. The Court concluded that, because the officers had no reason to believe that the bar patrons were in any way connected with the illegal drug activities of the bartender, such a search was an unreasonable invasion of privacy. *Id.* at 91–94, 100 S.Ct. at 342–44. Patients in birthing clinics are surely entitled to as much protection as patrons in a bar. Not only did the searchers of the [clinic] have no reason to believe that the couple was party to the wrongdoing underlying the warrant, they knew that they were not and had not been practicing medicine without a license. A warrant to search a medical establishment for the records and tools of the unauthorized practice of medicine cannot reasonably be relied upon to authorize the

> nonconsensual search of the person or effects of those known to be innocent patients or bystanders.

*Id.* at 652.

*Hummel-Jones* is not directly applicable to the case at bar because, like *Ybarra*, it addresses the rights of third parties that are collaterally affected during a search targeted at another person, property, or criminal activity. Here, Defendant's property was the subject of the search and his status as a guest in N.H.'s house does not provide him additional protection from a search. Unlike *Hummel-Jones*, here law enforcement was specifically looking for items belonging to Defendant, who officers had observed at the K Street residence before December 30, 2025, and who officers believed had a significant relationship with N.H., who resided at the residence. Similarly, Defendant's reliance on *United States v. Flores*, 679 F.2d 173 (9th Cir. 1982) for the proposition that "standing alone, a suspect's mere presence or arrest at a residence is too insignificant a connection with that residence," *id.* at 175, to support a search warrant is also distinguishable. As discussed above, law enforcement relied on more than Defendant's arrest at the K Street residence to obtain the search warrant.

The requisite nexus between the evidence to be seized and the place to be searched is a closer question. Relying primarily on *United States v. Roberts*, 975 F.3d 709 (8th Cir. 2020), the Government asserts that "[b]ased on the totality of the information in the affidavit, it is not an unreasonable inference that evidence of the shooting that defendant was involved in just 10 days earlier would be found at [the K Street residence]." (Doc. 49-1 at 17.) In *Roberts*, the defendant argued that evidence seized from his residence should have been suppressed "because there was no probable cause for the search." 975 F.3d at 713.

The affidavit attached to the *Roberts* search warrant application contained the following information:

Levetzow's affidavit recited that, prior to the shooting, two females were in the Village Inn restaurant with two suspects. One suspect arrived in a tan Ford Mustang belonging to Antoine Flournoy, the other in a silver Nissan Altima belonging to Flournoy's girlfriend, Tennille Davis. "Both show 5901 Elmore Ave. #I6, Davenport as their address." When the victim arrived, the suspects canceled their food order, moved their vehicles out of view from the Village Inn parking lot, and waited in their vehicles for eleven minutes. A silver Dodge Durango arrived and drove through the parking lot to where the other two vehicles were parked. The Durango reappeared, drove through the parking lot, and dropped off suspect #1, a man dressed in a red hooded sweatshirt. Suspect #1 ran to a dumpster, joined suspect #2, and both men shot the victim as he left the Village Inn and walked to his vehicle. The shooters fled and were picked up by the Durango, which drove back to the shooters' vehicles. All three vehicles then drove off together, turning north onto Interstate 74.

The affidavit further recites: (1) Flournoy's Mustang was stopped by Moline police on July 23. Flournoy was cited for no valid license, released, and was picked up by the Nissan Altima. (2) When stopped, Flournoy was being followed by a silver Dodge Durango registered to Sanders at 5901 Elmore Ave. #R1, Davenport. The Durango was stopped, and the officer later identified the driver as [the defendant], whose address is also 5901 Elmore Ave. #R1, Davenport. (3) Flournoy's Mustang was towed and ammunition was found in the trunk. (4) Police records show a May 17 traffic stop in Davenport in which [the defendant] and Flournoy were in the Durango.

The affidavit states that this information indicates the Mustang, Altima, and Durango "are related to our shooting," and it indicates "relationships by address and involvements between" Flournoy and Davis, [the defendant] and Sanders, and Flournoy and [the defendant]. In addition, the July 7 video indicates the three vehicles "met up prior to the shooting and fled the area together. In order for this to happen there needed to be communication between the involved parties by the use of cellular phones." The application requested a warrant to search the Dodge Durango and "5901 Elmore Ave. #R1, Davenport, IA" for firearms, ammunition, cell phones, and the red sweatshirt. The District Judge issued the warrant, reciting that the items to be seized are property used or possessed with intent to be used to commit

> an offense or concealed to prevent discovery of an offense, and property "relevant and material as evidence in a criminal prosecution."

*Id.* at 714.

On appeal, the defendant argued that "the application failed to establish sufficient nexus between evidence to be seized and the place to be searched because nothing in the affidavit suggested that [the defendant] was in the Durango at the time of the shooting or that any contraband or evidence of a crime would be found in [the defendant's] possession." *Id.* The Eighth Circuit determined that "the detailed affidavit provided the warrant-issuing judge a substantial basis for finding probable cause." *Id.* at 714-15 (quotation omitted). The Eighth Circuit explained that:

> The surveillance video established that a silver Dodge Durango was at the Village Inn shooting and drove one shooter in a red hooded sweatshirt to a place from which he ran to the dumpster and shot the victim. The Durango picked up the shooters as they fled, and -- joining the Mustang and Altima -- left the scene. Police records established that [the defendant] was driving a silver Durango as it followed Flournoy's Mustang on July 23, and that Flournoy was with [the defendant] when the Durango was stopped in May. [The defendant] lived with Sanders at the Elmore address. The address for Flournoy and Davis was a different unit at the same address. This information gave the issuing judge probable cause to believe that [the defendant] drove the Durango on the night of the shooting, and that evidence of the crime that had not yet been discovered -- the firearms, ammunition, red hooded sweatshirt, and cell phones used to communicate between the shooters and the driver of the Durango -- would be found in the Durango or in the residence [the defendant] shared with Sanders. *See United States v. Steeves*, 525 F.2d 33, 38 (8th Cir. 1975) (people generally keep firearms at home or on their person). Thus, the totality of the circumstances found within the four corners of the search warrant affidavit created "a fair probability that contraband or evidence of a crime will be found in the place[s] to be searched." [*United States v.*] *Seidel*, 677 F.3d [334,] 337 [(8th Cir. 2012)].

*Id.* at 715.

Here, the information included in the affidavit provided that: (1) using surveillance video from the Green Gable of the December 20, 2025 shooting, law enforcement was able to identify Defendant as the shooter; (2) surveillance video also showed Defendant appearing to take a handgun from the shooting victim; (3) surveillance video also showed Defendant arriving at the Green Gable before the shooting and leaving the Green Gable after the shooting in a Jaguar; (4) law enforcement observed Defendant was at the K Street residence on December 2, 2025; (5) law enforcement observed Defendant driving two vehicles, the Jaguar and a Genesis rented in Defendant's name, at the K Street residence; (6) between November 5, 2025 and December 30, 2025, a pen register on Defendant's phone showed approximately 685 contacts with N.H., who was associated with the K Street residence; (7) law enforcement believed that Defendant and N.H. had a close relationship and Defendant "frequents" the K Street residence; (8) the Jaguar that left the Green Gable after the shooting on December 20, 2025 was seen on December 30, 2025 at the K Street residence; and (9) on December 30, 2025, law enforcement knew that Defendant had been at the residence because he had been arrested earlier that morning on the federal arrest warrant.

Similar to *Roberts*, and, based on the totality of the information in the affidavit, particularly the evidence that Defendant was involved in the shooting at the Green Gable, Defendant's history of being observed at the K Street residence, and Defendant being arrested earlier on December 30, 2025 at the K Street residence, it is not unreasonable for the judge to infer that evidence of the Green Gable shooting would be found at the K Street residence. 975 F.3d at 715; *United States v. Thompson*, 210 F.3d 855, 860 (8th Cir.2000) (providing that judges "may draw reasonable inferences from the totality of the circumstances in determining whether probable cause exists to issue a warrant.").

The crux of the nexus issue involves (a) Defendant's connection to the residence and (b) the likelihood of finding evidence of the Green Gable shooting located there.

Defendant focuses on reasons that might cast doubt about the issuing judge's determination. The applicable standard, however, is merely "probable cause" which "exists when, viewing the totality of the circumstances, 'there is a fair probability that contraband or evidence of a crime will be found in a particular place.'" *Reed*, 921 F.3d at 757. I find that there was a substantial basis for the issuing judge to have found the requisite "nexus" between the evidence to be seized and the place to be searched. *See Schave*, 55 F.4th at 676; *Roberts*, 975 F.3d at 715 ("This information gave the issuing judge probable cause to believe that [the defendant] drove the Durango on the night of the shooting, and that evidence of the crime that had not yet been discovered -- the firearms, ammunition, red hooded sweatshirt, and cell phones used to communicate between the shooters and the driver of the Durango -- would be found in the Durango or in the residence [the defendant] shared with Sanders. *See United States v. Steeves*, 525 F.2d 33, 38 (8th Cir. 1975) (people generally keep firearms at home or on their person)."). The evidence in the affidavit, while not conclusive about either Defendant's actual place of residence or the presence of evidence, established Defendant's substantial connection to the residence and the judge could infer there was a fair probability of finding evidence at the K Street address.

Accordingly, based on the totality of the circumstances outlined above, and paying great deference to the issuing court's probable cause determination in the search warrant, I find that the issuing judge had a substantial basis for concluding that probable cause existed and that there was a fair probability that contraband or evidence of a crime would be found at the K Street residence. *See Reed*, 921 F.3d at 757; *Johnson*, 848 F.3d at 876; *Kail*, 804 F.2d at 444. Thus, I find that there was substantial evidence to support the issuing judge's determination of probable cause for the December 30, 2025 search warrant for the K Street residence sought by Inv. Bell, Defendant's Exhibit C. Therefore, I recommend that the motion to suppress be denied.

### *E. Is the* **Leon** *good faith exception applicable?*

Alternatively, if the Court determines that the search warrant for the K Street residence lacked probable cause, the *Leon* good faith exception should be applied to make the evidence admissible.

Under the good faith exception articulated in *United States v. Leon*, even if a reviewing court determines substantial evidence to issue a warrant is absent, the court should not suppress evidence seized pursuant to the search warrant if the officers executing the search warrant acted in objectively reasonable reliance on the issuance of the warrant by a neutral magistrate or judge. 468 U.S. 897, 922 (1984); *United States v. Houston*, 665 F.3d 991, 994-95 (8th Cir. 2012). "In making this determination, we ask 'whether a reasonably well-trained officer would have known that the search was illegal despite a judge's issuance of the warrant.'" *United States v. Lopez-Zuniga*, 909 F.3d 906, 909 (8th Cir. 2018) (quoting *United States v. Jackson*, 784 F.3d 1227, 1231 (8th Cir. 2015)).

Under the "good-faith exception," if a law enforcement officer's reliance on a warrant was objectively reasonable, the evidence seized pursuant to an invalid warrant will not be suppressed. *United States v. Proell*, 485 F.3d 427, 430 (8th Cir. 2007). *Proell* noted that *Leon* identified four scenarios where it is not objectively reasonable for the executing officer to rely on a warrant issued by a magistrate:

> (1) when the affidavit or testimony supporting the warrant contained a false statement made knowingly and intentionally or with reckless disregard for its truth, thus misleading the issuing judge; (2) when the issuing judge "wholly abandoned his judicial role" in issuing the warrant; (3) when the affidavit in support of the warrant is "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable"; and (4) when the warrant is "so facially deficient" that no police officer could reasonably presume the warrant to be valid.

*Id.* at 431 (citing *Leon*, 468 U.S. at 923; *United States v. Puckett*, 466 F.3d 626, 630 (8th Cir. 2006)).

*Leon* explained that "[s]earches pursuant to a warrant will rarely require any deep inquiry into reasonableness, for a warrant issued by a judge normally suffices to establish that a law enforcement officer has acted in good faith in conducting the search." 468 U.S. at 922 (quotations omitted). Nevertheless, "in some circumstances the officer will have no reasonable grounds for believing that the warrant was properly issued." *Id.* at 922-23 (footnote omitted). "For the *Leon* exception to apply when the warrant is based on evidence obtained through a Fourth Amendment violation, [law enforcement's] prewarrant conduct must have been 'close enough to the line of validity to make the officers' belief in the validity of the warrant objectively reasonable.'" *United States v. Cannon*, 703 F.3d 407, 413 (8th Cir. 2013) (quoting *United States v. Conner*, 127 F.3d 663, 667 (8th Cir. 1997)). If the prewarrant conduct is clearly illegal, however, the exception does not apply. *Cannon*, 127 F.3d at 413.

At the outset, I find that there is no evidence that the affidavit in support of the search warrant contained any false statements or that the issuing judge was misled in any way. There is also no evidence that the issuing judge "wholly abandoned" her judicial role in issuing the search warrant. Further, there is no allegation or evidence that the warrant is "so facially deficient" that a police officer could not reasonably presume that the warrant was valid.

Defendant, relying on *United States v. Wilson*, 153 F.4th 478 (5th Cir. 2025), argues that "the affidavit in the Defendant's case did not connect the residence with evidence of the shooting, and law enforcement could not have objectively believed there was such a nexus." (Doc. 41-1 at 7.) First, as discussed above, the judge made common sense and reasonable inferences based on the totality of the circumstances in finding that the search warrant application and affidavit were supported by probable cause. See *Kail*,

804 F.2d at 444; *Thompson*, 210 F.3d at 860. Also, contrary to Defendant's contentions, and as discussed above, based on the affidavit in support of the warrant application, the issuing judge had a substantial basis and made "a practical and common-sense" determination, based on the totality of the circumstances, that "a search would uncover evidence of wrongdoing" and/or contraband; and therefore, the affidavit was not "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." *See Kail*, 804 F.2d at 444; *Maccani*, 49 F.4th at 1130; *Proell*, 485 F.3d at 431.

Second, the third *Leon* scenario presents a hurdle that is difficult for a defendant to overcome, i.e., an affidavit must be so lacking in probable to render official belief in its existence must be *entirely unreasonable*. *See United States v. Carpenter*, 341 F.3d 666, 670 (8th Cir. 2003) ("'Entirely unreasonable' is not a phrase often used by the Supreme Court, and we find nothing in *Leon* or in the Court's subsequent opinions that would justify our dilution of the Court's particularly strong choice of words."). Third, "[w]here the alleged Fourth Amendment violation involves a search or seizure pursuant to a warrant, the fact that a neutral magistrate has issued a warrant is the clearest indication that the officers acted in an objectively reasonable manner or, as we have sometimes put it, in 'objective good faith.'" *Messerschmidt v. Millender*, 565 U.S. 535, 546 (2012) (citing *Leon*, 468 U.S. at 922–923); *see also United States v. Gibson*, 928 F.2d 250, 253-54 (8th Cir. 1991) ("Ordinarily, a police officer cannot be expected to question a judge's probable cause determination."). Fourth, Inv. Bell knew the judge that signed the search warrant and knew her background, i.e., that she had been a judge for 20 years and had been a county prosecutor. (Bell Hr'g Test. at 92.) *See United States v. Bieri*, 21 F.3d 811, 816 (8th Cir. 1994) (finding that a law enforcement officer could assume the lawfulness of a warrant "issued by a judge with many years of experience"); *see also United States v. Perry*, 531 F.3d 662, 665 (8th Cir. 2008) (holding

that a law enforcement officer "executing a search warrant may rely in the permissibility of the issuing judge's inference that . . . a nexus exists when that inference has common sense appeal") (citation omitted).

Fifth, "[w]hen assessing the objective [reasonableness] of police officer executing a warrant, we 'must look to the totality of the circumstances,' including any information known to the officers, but not presented to the issuing judge.'" *United States v. Marion*, 238 F.3d 965, 969 (8th Cir. 2001) (second alteration in original) (quoting *United States v. Simpkins*, 914 F.2d 1054, 1057 (8th Cir. 1990)). In *Marion*, which involved a narcotics investigation, the officer did not inform the issuing judge that he observed the defendant make several stops after leaving a motel which in his training and experience was consistent with narcotics distribution. The officer also did not include information that cocaine found prior to the motel search was consistent with distribution amounts and not personal use. 238 F.3d at 969. The Eighth Circuit determined that this information along with the information provided in the affidavit "was sufficient to show that the executing officers' reliance on the issuing judge's determination of probable cause to search the motel room for evidence of drug activity was objectively reasonable." *Id.* Here, Inv. Bell testified that he knew but did not include in his affidavit that, in his experience of working multiple shooting cases, that after a shooting, the shooter will typically go someplace other than their residence[14] and "hang low, stay low," and it is common for individuals involved in shootings to remain armed and keep firearms on their person or near to them for protection from potential retaliation. (Bell Hr'g Test. at 94-95.)

---

[14] Law enforcement had checked the residence listed on Defendant's driver's license (as found in the earlier traffic stop), but Defendant was not going there "quite as much." (Brand Hr'g Test. 54.) Thus, it makes some sense to be searching for Defendant and any evidence at place he may be staying other than his official residence.

Sixth, in *United States v. Diaz*, the Eighth Circuit stated that "[w]e have applied the good-faith exception . . . when an affidavit did not establish a nexus between the search location and the suspected contraband." 154 F.4th 621, 629 (8th Cir. 2025) (quoting *United States v. Mayweather*, 993 F.3d 1035, 1041 (8th Cir. 2021)). Further the Eighth Circuit stated that the "information in the affidavit gave the issuing magistrate probable cause to believe that Diaz had been involved in recent drug trafficking, creating an inference that drug-related contraband would be found in his home. The lack of a boilerplate statement in the warrant affidavit that drug dealers store contraband in their home was at most a 'technical legal deficiency.'" *Id.* (quoting Randle, 39 F.4th at 537). Additionally, the Eighth Circuit determined that "[c]onsidering the information Deputy Stange knew but did not present to the issuing magistrate, and the inferences that could reasonably be drawn from that information, the district court did not err in holding that the *Leon* good faith exception applied and denying the motion to suppress evidence seized in the warrant search of the home." *Id.* Given the information Inv. Bell knew that he did not include in his affidavit discussed above and the information contained in the affidavit, it was not "entirely unreasonable" for Inv. Bell to believe firearms and other evidence related to the Green Gable shooting would be located at the K Street residence.

Finally, *United States v. Wilson*, relied upon by Defendant is distinguishable. In Wilson, the Fifth Circuit described the affidavit at issue as follows:

> Here, the affidavit offered nothing—no observations, no inferences, no corroborated tips—linking the Waffle House incident to 212 Central. It described the building's appearance and labeled it "Wilson's apartment," noted that "witnesses have confirmed seeing Wilson at the residence," and leapt from residence to contraband with nothing more than the bald assertion that items "related to" the Waffle House investigation were "believed to be located" there. That was it. That is assertion without substantiation—ipse dixit in place of evidence. Not one fact—not even a conclusory allegation—tied the alleged assault to contraband inside 212 Central.

153 F.4th 478, 485. Further, the Fifth Circuit stated that the affidavit's "conclusory assertion that officers 'believed' contraband was located at the residence supplied no such connection, and "we are . . . unable to rely upon the existence of criminal activity [at the residence] because of the conclusory nature of the affidavit." *Id.* at 487 (alteration in original). The Fifth Circuit concluded that the good faith exception was inapplicable because the "good-faith exception preserves the exclusionary rule for precisely these cases: when warrants are so untethered from facts that treating them as valid would erase the probable-cause requirement itself." *Id.* at 489. Unlike *Wilson*, in the instant case the affidavit, as thoroughly discussed above, does not offer "nothing—no observations, no inferences, no corroborated tips," does not offer "nothing more than bald assertion[s]," is not conclusory, and is not "so untethered from facts that treating them as valid would erase the probable-cause requirement itself." *Id.* at 485, 487, 489. Moreover, the dissent in *Wilson* is more in line with the instant case and Eighth Circuit case law:

> The search warrant affidavit explained that "[Ricky] Wilson is suspected of pulling a firearm from his backpack while inside of the Waffle House located at 559 Behrman Highway during a verbal argument with another patron." The affidavit goes on to detail the relevant events in multiple paragraphs.
>
> The affidavit then named "Wilson's residence" at 212 Central Avenue—just miles from the Waffle House—as a place where his "firearms" as well as "other evidence related to criminal activity" were "BELIEVED TO BE LOCATED." The affidavit further noted that "Wilson's girlfriend rents the apartment and witnesses have confirmed seeing Wilson at the residence."
>
> So this was far from a "bare bones" affidavit. To the contrary, the officers were fully justified in relying on the warrant, in light of the longstanding common sense intuition that people keep sensitive possessions at home. It seems obvious, then, that this case falls well within the good faith exception

> to the exclusionary rule. If federal and state judges can reasonably infer that people who own firearms store them in their home, then surely police officers may do so in good faith as well. *See*, *e.g.*, *Nevarez v. Coleman*, 2022 WL 2528237, *8 (E.D. La.) (finding it "reasonable to infer that to the extent Nevarez had any firearms, ammunition, or home security footage of the encounter, that such items would be stored in his home or car"); *Smoot v. Vannoy*, 2018 WL 2977237, *19 (E.D. La.) ("Both federal and Louisiana courts have found a sufficient nexus to search a defendant's residence for guns and clothing in similar circumstances.") (collecting cases). I would reverse.
>
> * * *
>
> The majority declines to embrace the normal, common sense inference that people keep their personal possessions at home. As the majority puts it, "[i]f the mere fact of a residence sufficed—that is, if 'common sense' became too common—probable cause to arrest would automatically yield probable cause to search a home." *Ante*, at 488 n.48.
>
> This statement misunderstands the legal principles that govern our circuit. The point is not that probable cause to arrest automatically yields probable cause to search a home—but that it normally does. *See*, *e.g.*, *United States v. Flanders*, 468 F.3d 269, 271–72 (5th Cir. 2006) (embracing the "general" principle that "few places are more convenient than one's residence for use in planning criminal activities and hiding fruits of a crime").

*Id.* at 490-91 (alteration in original) (Ho, J., dissenting).

Thus, based on all the foregoing, I find the affidavit was not "so lacking in indicia of probable cause as to render official belief in its existence *entirely unreasonable*." *See Kail*, 804 F.2d at 444 (emphasis added). Further, I find that law enforcement's conduct was close enough to the line of validity to justify law enforcement's belief that the search warrant was objectively reasonable. *See id.* Accordingly, as an alternative, I recommend that Defendant's motion to suppress be denied under the *Leon* good faith exception.

## *IV. CONCLUSION*

For the reasons set forth above, I respectfully recommend the District Court **deny** Defendant's Motion to Suppress. **(Doc. 41.)**

Objections to this Report and Recommendation in accordance with 28 U.S.C. Section 636(b)(l) and Fed. R. Crim. P. 59(b) must be filed within fourteen (14) days of the service of a copy of this Report and Recommendation. Objections must specify the parts of the Report and Recommendation to which objections are made, as well as the parts of the record forming the basis for the objections. *See* Fed. R. Crim. P. 59. Failure to object to the Report and Recommendation waives the right to *de novo* review by the district court of any portion of the Report and Recommendation as well as the right to appeal from the findings of fact contained therein. *United States v. Wise,* 588 F.3d 531, 537 n.5 (8th Cir. 2009).

**DONE AND ENTERED** at Cedar Rapids, Iowa, this 9th day of September, 2026.

Mark A. Roberts, United States Magistrate Judge
Northern District of Iowa